# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

SCOTT A. BAYMILLER, et al.,  )
   Plaintiffs,  )
   v.  )   3:11-cv-858-RCJ-VPC
   )
RANBAXY PHARMACEUTICALS, INC., et al.,  )   **ORDER**
   )
   Defendants.  )
_____ )

Currently before the Court is Glaxosmithkline LLC's motion for summary judgment (#59). For the following reasons, the Court grants Glaxosmithkline LLC's motion for summary judgment (#59) in its entirety.

## BACKGROUND

In November 2011, Defendant Glaxosmithkline LLC filed a petition for removal and attached the complaint from the Second Judicial District Court in Washoe County, Nevada. (Pet. for Removal (#1); Compl. (#1) at 11-27). In the complaint, Plaintiffs Scott A. Baymiller, Kathleen Lynn Baymiller, Mary Arlayne Baymiller, and Scott A. Baymiller as the Co-Special Administrator of the Estate of Charles Alan Baymiller (collectively "Plaintiffs") sued Defendants Ranbaxy Pharmaceuticals, Inc., Aurobindo Pharma USA, Teva Pharmaceutical USA, Glaxosmithkline LLC ("Glaxo"), CVS Pharmacy, Inc., and Rite Aid Corporation (collectively "Defendants"). (Compl. (#1) at 11).

The complaint alleged the following. (*Id.* at 12). Scott Baymiller and Kathleen Baymiller were the son and daughter of Mary Baymiller and Charles Baymiller, deceased. (*Id.*). Mary Baymiller was the surviving wife of Charles Baymiller. (*Id.*). Ranbaxy was a corporation that

had engaged in the design, manufacture, production, testing, study, research, mixture, labeling, marketing, advertising, sales, promotion, and/or distribution of pharmaceutical products, including Lorazepam, which was used to treat anxiety, acute seizures, and insomnia. (*Id.* at 13). Aurobindo was a corporation that had engaged in the design, manufacture, etc. of Paroxetine HCL, which was used to treat depression, obsessive-compulsive disorder, panic disorder, and anxiety. (*Id.*). Teva was a corporation that had engaged in the design, manufacture, etc. of Paroxetine HCL. (*Id.*). Glaxo was a corporation that had engaged in the design, manufacture, etc. of Paxil, which was used to treat depression, obsessive-compulsive disorder, and anxiety disorder. (*Id.* at 13-14). CVS was a corporation that was engaged in the sales and/or distribution of Lorazepam, Paroxetine HCL, and Paxil in Nevada. (*Id.* at 14). Rite Aid was a corporation that had engaged in the sales and/or distribution of Paroxetine HCL in Nevada. (*Id.*).

The complaint alleged the following. Since 1992, Glaxo had promoted, advertised, and made claims and representations to the medical profession and general public that Paxil was a "safe and effective drug for treatment of depression" (*Id.* at 15). Paroxetine HCL, as manufactured by Aurobindo and Teva, was the generic equivalent to Paxil. (*Id.*). Aurobindo and Teva had sold Paroxetine HCL to CVS and Rite Aid pursuant to a sales contract. (*Id.*).

The complaint alleged the following. Upon information and belief, studies had been conducted and were "available to Defendants showing that Paxil, and its generic Paroxetine HCL, [could] cause extrapyramidial reactions including akathisia associated with violence, self-harm, and psychotic episodes." (*Id.*). Defendants were aware of the documented increased instances of violence both to oneself and others. (*Id.*).

The complaint alleged the following. Ranbaxy had sold and distributed Lorazepam, a generic equivalent to Ativan. (*Id.*). Ranbaxy had sold Lorazepam to CVS pursuant to a sales contract. (*Id.*). Prior to October 4, 2009, there existed sufficient studies that were available to Defendants to make them aware of the side effects of mixing Lorazepam and Paroxetine HCL. (*Id.* at 15-16). Prior to October 4 or 5, 2009, Defendants had designed, manufactured, packaged, and sold Paroxetine HCL and/or Lorazepam. (*Id.* at 16). Upon information and

2

belief, "Defendants [were] responsible for placing said product in the hands of users" particularly Mary Baymiller on October 4 or 5, 2009. (*Id.*). Defendants had placed a defective and unreasonably dangerous product or combination of products, i.e. Paroxetine HCL and Lorazepam, in the hands of Mary Baymiller without adequate warnings concerning its safe and proper use. (*Id.*). On October 4 or 5, 2009, while under the influence of prescribed Lorazepam and Paroxetine HCL individually and/or in combination and "in a state of somnambulism, while under the associated side effect of the drugs, did use force and violence upon her husband," Charles Baymiller, to cause his death on October 5, 2009, and to cause self-harm and violence to herself. (*Id.*).

The complaint alleged the following. Defendants had a duty and were required to warn about the serious hazards associated with the drugs individually and in combination with other drugs as soon as there was "reasonable evidence of association." (*Id.*). Defendants' U.S. packaging inserts and marketing materials had failed to warn about the associated risks of homicidal behaviors or acts of violence toward others. (*Id.*).

The complaint alleged seven causes of action against Defendants, including: (1) strict products liability (unreasonably dangerous product); (2) strict products liability (inadequate warnings); (3) negligence; (4) breach of implied warranty; (5) breach of express warranty; (6) fraud upon purchaser and misrepresentation, pursuant to NRS § 41.600; and (7) statutory abuse and neglect of a person older than 60 years old pursuant to NRS § 41.1395. (*Id.* at 17-26).

This Court granted the parties' stipulations to dismiss Defendants Ranbaxy Pharmaceutical, Inc., Teva Pharmaceuticals USA, Inc., and Aurobindo Pharm USA, Inc. with prejudice from this case. (Orders (#43, 48, 55)). In July 2012, this Court granted Rite Aid Corporation and CVS Pharmacy, Inc.'s motions to dismiss in their entirety without leave to amend. (Order (#68) at 9). The only remaining defendant in this case is Glaxosmithkline, LLC ("Glaxo"). Glaxo now files the pending motion for summary judgment (#59).

It is undisputed that Glaxo is the manufacturer of the brand name medication Paxil, a prescription antidepressant that Mary Baymiller did *not* purchase or use. (Joint Case Mgmt.

Report (#56) at 2).

## LEGAL STANDARD

In reviewing a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). Pursuant to Fed. R. Civ. P. 56, a court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are "facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the initial burden of identifying the portions of the pleadings and evidence that the party believes to demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). Once the moving party has properly supported the motion, the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. The nonmoving party cannot defeat a motion for summary judgment "by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Where the record taken as a whole could not lead a rational trier

of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356.

**DISCUSSION**

In its motion for summary judgment, Glaxo argues that it is entitled to summary judgment because it is undisputed that Plaintiffs did not purchase or use any Glaxo product but instead used a generic product from another manufacturer. (Mot. for Summ. J. (#59) at 4). Glaxo argues that, under Nevada law, Plaintiffs have no viable cause of action against the manufacturer of a prescription drug unless they purchased or used that manufacturer's product. (*Id.*). Glaxo relies on *Moretti v. Wyeth, Inc.*, 2009 WL 749532 (D. Nev. 2009) and *Foster v. Am. Home Prod. Corp.*, 29 F.3d 165 (4th Cir. 1994) to support its arguments. (*Id.*). Glaxo argues that, under Nevada law, in order to establish a strict products liability claim, the plaintiff must establish that the defendant manufactured or sold the specific product that injured the plaintiff. (*Id.* at 6). Glaxo asserts that, under Nevada law, only a manufacturer or seller of a product owes a duty of care and, thus, Plaintiffs cannot establish a claim for negligence. (*Id.* at 7). Glaxo asserts that, under Nevada law, only a seller of a product can be held liable under an express or implied warranty claim. (*Id.*). Glaxo argues that, under Nevada law, Plaintiffs cannot succeed on a fraud/negligent misrepresentation claim unless they purchased or used a product manufactured or sold by the defendant manufacturer. (*Id.* at 8). Glaxo asserts that Nevada law is in line with at least 60 decisions from across the country that have held that a brand-name manufacturer cannot be liable for a plaintiff's injury caused by a generic equivalent of their medication. (*Id.*). Glaxo asserts that the Supreme Court's decision in *PLIVA, Inc. v. Mensing*, __ U.S. __, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011) did not overturn *Moretti* or *Foster*. (*Id.* at 11-12). Glaxo also argues that Plaintiffs' claim for elder abuse fails as a matter of law because it never willfully or unjustifiably inflicted pain on Mary or Charles Baymiller because it had no relationship with Plaintiffs. (*Id.* at 14).

In response, Plaintiffs rely on *Conte v. Wyeth, Inc.*, 85 Cal. Rptr. 3d 299 (Cal. Ct. App. 2008) to support their argument that Glaxo can be held liable under misrepresentation theories for injuries to a plaintiff that ingested a generic version of a drug that Glaxo did not

5

manufacture, sell, or distribute. (Opp'n to Mot. to Summ. J. (#63) at 8-9). Plaintiffs argue that their claims are not product liability claims but rather misrepresentation claims that allege that Glaxo's misrepresentations caused the harm. (*Id.* at 8). Plaintiffs assert that the Restatement (Second) of Torts supports the holding that Glaxo is liable for misrepresentations to Plaintiffs who did not ingest any of Glaxo's drugs. (*Id.* at 12).

In reply, Glaxo asserts that Plaintiffs fail to address the Nevada law that precludes each of their claims. (Reply to Mot. for Summ. J. (#64) at 3). Glaxo asserts that a majority of courts have agreed with *Foster* and *Moretti* and that there has been almost a universal rejection of *Conte*. (*Id.* at 5). Glaxo argues that, to its knowledge, every court that has issued a post-*Mensing* decision on brand-name manufacturer liability for generic medications has adopted *Foster*'s reasoning and has rejected *Conte*'s reasoning. (*Id.* at 6). Glaxo asserts that *Mensing* did not change products liability law but instead recognized that a generic product's warning is deemed to be adequate under federal law so long as they copy the brand-name label. (*Id.* at 11).

The issue in this case is whether Nevada law recognizes negligent misrepresentation/fraud claims against brand-name drug manufacturers who did not manufacture or sell the generic drug that allegedly caused Plaintiffs' injuries.

Under the 1962 Drug Amendments to the Federal, Food, Drug, and Cosmetic Act, "a manufacturer seeking federal approval to market a new drug must prove that it is safe and effective and that the proposed label is accurate and adequate." *Mensing*, __ U.S. at __, 131 S.Ct. at 2574. In 1984, Congress passed the Drug Price Competition and Patent Term Restoration Act, or the Hatch-Waxman Amendments, that stated generic drugs could gain Food and Drug Administration ("FDA") approval by showing equivalence to a reference listed drug that had already been approved by the FDA. *Id.* This allowed "manufacturers to develop generic drugs inexpensively, without duplicating the clinical trials already performed on the equivalent brand-name drug." *Id.* A generic drug application had to "show that the safety and efficacy labeling proposed . . . [was] the same as the labeling approved for the brand-name drug." *Id.* (quotation alterations omitted). Thus, a "brand-name manufacturer seeking new

6

drug approval is responsible for the accuracy and adequacy of its label" and "[a] manufacturer seeking generic drug approval . . . is responsible for ensuring that its warning label is the same as the brand name's." *Id.*

In *Foster*, the Fourth Circuit addressed "whether the district court correctly held that a manufacturer of a brand name prescription drug may be held liable on a negligent misrepresentation theory for a death caused by another company's generically equivalent drug." *Foster*, 29 F.3d at 167. The Fourth Circuit held that a brand-name manufacturer could not be held liable on a negligent misrepresentation theory for injuries resulting from use of another manufacturer's product. *Id.*

In that case, parents brought a lawsuit against a brand-name prescription drug manufacturer, Wyeth, when their daughter died after being given the generic equivalent of one of Wyeth's brand-name prescription drugs. *Id.* at 166. The complaint against Wyeth alleged negligence-wrongful death, negligence-survivorship, strict liability, and breach of warranty. *Id.* at 167. The district court also found that the complaint sounded in negligent misrepresentation. *Id.* The district court granted Wyeth summary judgment on the negligence, strict liability, and breach of warranty counts because Wyeth had not manufactured the generic drug at issue, but permitted the negligent misrepresentation claim to stand. *Id.*

The Fourth Circuit held that "[a]lthough actions for negligent misrepresentation arise in many contexts other than products liability, in this case the allegations of negligent misrepresentation are an effort to recover for injuries caused by a product without meeting the requirements the law imposes in products liability actions." *Id.* at 168. The Fourth Circuit held that Maryland law required a plaintiff seeking to recover for an injury by a product to demonstrate that the defendant had manufactured the product at issue. *Id.* The Fourth Circuit found that the parents were attempting to hold Wyeth liable for injuries caused by another manufacturer's product and were persuaded that the Maryland courts would reject the effort to circumvent the necessity that a defendant be shown to have manufactured the product that caused an injury prior to being held liable for such injury. *Id.*

The Fourth Circuit also found that the negligent misrepresentation action failed because

Wyeth was under no duty of care to the plaintiffs. *Id.* at 171. The Fourth Circuit held that the "duty required for the tort of negligent misrepresentation arises when there is 'such a relation that one party has the right to rely for information upon the other, and the other giving the information owes a duty to give it with care.'" *Id.* (quotations omitted). The Fourth Circuit held that there was no such relationship between the parties in that case because the daughter was injured by a product that Wyeth did not manufacture. *Id.* The Fourth Circuit concluded that Maryland law did not recognize a cause of action for negligent misrepresentation against one manufacturer for injuries caused by another manufacturer's product. *Id.* at 172.

In *Conte*, the California intermediate appellate court found that it was undisputed that the plaintiff only took the generic version of a drug. 89 Cal. Rptr. 3d at 305. The crux of the plaintiff's claim against all of the drug company defendants was that she was "injuriously overexposed to metoclopramide due to their dissemination of false, misleading and/or incomplete warnings about the drug's side effects." *Id.* The plaintiff alleged fraud, fraud by concealment, and negligent misrepresentation against the brand-name manufacturer, Wyeth. *Id.*

The *Conte* Court held that "the common law duty to use due care owed by a name-brand prescription drug manufacturer when providing product warnings extends not only to consumers of its own product, but also to those whose doctors foreseeably rely on the name-brand manufacturer's product information when prescribing a medication, even if the prescription is filled with the generic version of the prescribed drug." *Id.* at 304-05. The court rejected the argument that the case was a products liability lawsuit disguised as an action for fraud and misrepresentation. *Id.* at 309. The court found that there was no logical or legal inconsistency between allowing "a defendant that authors and disseminates information about a product manufactured and sold by another [to] be liable for negligent misrepresentation where the defendant should reasonably expect others to rely on that information and the product causes injury, even though the defendant would not be liable in strict products liability because it did not manufacture or sell the product." *Id.* at 311. The court believed that California law supported the plaintiff's position that Wyeth owed "a duty of due care to those

8

people it should [have] reasonably foresee[n] [were] likely to ingest metoclopramide in either the name-brand or generic version when it [was] prescribed by their physicians in reliance on Wyeth's representations." *Id.* at 318.

The only Nevada case to address this issue is *Moretti v. Wyeth, Inc.*, 2009 WL 749532 (D. Nev. 2009). In *Moretti*, it was undisputed that the plaintiff had never ingested any brand-name or generic drug manufactured or distributed by Wyeth or Schwarz. *Moretti*, 2009 WL 749532 at *2. It was also undisputed that the plaintiff had been diagnosed with a neurological disorder caused by the plaintiff's ingestion of generic metoclopramide manufactured and distributed by Pliva and/or Teva. *Id.* The plaintiff conceded summary judgment on her claims for strict products liability, breach of express warranty, breach of implied warranties, negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress against Wyeth and Schwarz because she [had] not purchase[d] or ingest[ed] any of Wyeth or Schwarz's product. *Id.* However, she continued to allege her misrepresentation/fraud claims against Wyeth and Schwarz for misrepresentation by omission, constructive fraud, negligent misrepresentation, and fraud by concealment. *Id.* The court found that the success of those claims rested on "whether Nevada law recognize[d] Plaintiff's misrepresentation/fraud claims against Wyeth and Schwarz, both brand name drug manufacturers who did not manufacture or sell the generic drug that allegedly caused Plaintiff's injuries." *Id.*

The *Moretti* Court found that the plaintiff's misrepresentation/fraud claims failed for the following reasons. *Id.* at *3. First, the court found that, under Nevada law, the plaintiff's misrepresentation/fraud claims required the existence of a duty, which at a minimum, required some form of relationship between the parties. *Id.* The court found that the plaintiff did not have a relationship with either defendant because she did not purchase or ingest a Wyeth or Schwarz product. *Id.* The court found that Wyeth and Schwarz did not owe a duty to warn or otherwise disseminate information about the risks associated with their generic competitors' drugs. *Id.*

Second, the court found that Nevada law recognized the tort of negligent

misrepresentation as defined in § 552 in the Restatement (Second) of Torts, but noted that Nevada law had limited the application of that tort to business transactions. *Id.* The court found that Nevada law did not recognize liability for personal injuries under the Restatement (Second) of Torts §§ 310 or 311. *Id.* The court concluded that because the plaintiff never purchased a Wyeth or Schwarz metoclopramide product there was no business transaction. *Id.*

Third, the court found that, under Nevada law, the plaintiff's claims failed because neither defendant had manufactured the product that had injured the plaintiff. *Id.* at *4. The court found that the result remained the same regardless of whether the plaintiff characterized her claims as misrepresentation/fraud or claims arising in product liability. *Id.*

Fourth, the court found that the *Conte* decision, including its foreseeability analysis, was contrary to well-established Nevada law. *Id.* The court also found that, with the exception of *Conte*, every other court that had considered the same issue had rejected the plaintiff's arguments. *Id.* The court found that *Conte* stood alone and was contrary to Nevada law and public policy. *Id.*

Fifth, the court found that none of the FDA statutes or regulations cited by the plaintiff stated that the brand-name manufacturer was responsible for the label of its competitors' generic drugs or imposed a duty advocated by the plaintiff. *Id.* The court then granted summary judgment in favor of Wyeth and Schwarz on all remaining claims. *Id.* at *5.

In 2011, the Supreme Court decided *PLIVA, Inc. v. Mensing*, which held that federal drug regulations applicable to generic drug manufacturers pre-empted state law claims that generic drug manufacturers had failed to provide adequate warning labels for generic metoclopramide. __ U.S. at __, 131 S.Ct. at 2572-73. The Supreme Court held that federal law required a generic drug manufacturer to ensure that its warning label was the same as the brand name's and that it was impossible for generic drug manufacturers to comply with the state law duty to attach a safer label to the generic metoclopramide. *Id.* at 2574, 2578.

*Phelps v. Wyeth*, __ F.Supp.2d __, 2012 WL 1499343 (D. Or. 2012) is the only published post-*Mensing* case in the Ninth Circuit that addresses the issue at hand. In *Phelps*,

it was undisputed that the plaintiffs only ingested generic metoclopramide produced by generic drug manufacturer defendants. *Id.* at *1-2. However, the plaintiffs also sued the brand-name defendants. *Id.* at *1. Prior to *Mensing*, the court had granted summary judgment in favor the brand-name defendants. *Id.* Post-*Mensing*, the plaintiffs filed a motion for relief from that ruling. *Id.* The plaintiffs argued that *Mensing* had overturned *Foster*, a case that the court had relied on to find that the brand-name manufacturers could not be held liable for an injury caused by the generic version of the drug. *Id.* at *2.

In *Phelps*, the court found that *Mensing* did not overturn *Foster*'s holding regarding the liability of brand-name manufacturers. *Id.* at *3. The court noted that the *Foster* Court's reluctance "to hold name-brand defendants liable for generic drugs did not depend on a generic manufacturer's ability to alter [a] label, but rather on concepts of foreseeability and duty." *Id.* The court found that, under Oregon product liability law, the brand-name defendants could not be found liable for the plaintiffs' injuries because the plaintiffs could not show that their injuries resulted from the use of the brand-name manufacturers' product. *Id.* The court further found *Foster* persuasive and that *Conte* was contrary to Oregon law. *Id.* at *5. The court concluded that "while name-brand defendants [were] required to provide adequate warnings, they [could not] be held liable for injuries caused by a generic manufacturer's products." *Id.*

In this case, the Court grants Glaxo's motion for summary judgment (#59) in its entirety. First, the Court grants summary judgment on claims 1 and 2 for strict products liability. Under Nevada law, a plaintiff who asserts a strict liability claim must establish that the defendant manufactured or sold the specific product that allegedly injured the plaintiff. *See Allison v. Merck & Co., Inc.*, 878 P.2d 948, 952 (Nev. 1994) (holding that a plaintiff must establish that his injury was "caused by a defect in the product, and that such defect existed when the product left the hands of the defendant"). In this case, it is undisputed that Mary Baymiller never used any product manufactured or sold by Glaxo. As such, the Court grants summary judgment to Glaxo on claims 1 and 2.

Second, the Court grants summary judgment on claims 4 and 5 for breach of implied

and express warranties. Under Nevada law, only sellers of products can provide express and implied warranties. *See* Nev. Rev. Stat. §§ 104.2313-2315. Because it is undisputed that Glaxo never sold or distributed the generic drugs that allegedly caused Mary Baymiller's injuries, the Court grants summary judgment on claims 4 and 5.

Third, the Court grants summary judgment on claim 7 for elder abuse. Pursuant to NRS § 41.1395, a person who causes an older person or a vulnerable person to suffer a personal injury or death that is caused by abuse or neglect is liable to the older person or vulnerable person. Nev. Rev. Stat. § 41.1395(1). "Abuse" means willful and unjustified (1) "[i]nfliction of pain, injury or mental anguish," or (2) "[d]eprivation of food, shelter, clothing or services which are necessary to maintain the physical or mental health of an older person or a vulnerable person." Nev. Rev. Stat. § 41.1395(4)(a)(1)-(2). "Neglect" means "the failure of a person who has assumed legal responsibility or a contractual obligation for caring for an older person or a vulnerable person." Nev. Rev. Stat. § 41.1395(4)(c). Here, Glaxo did not neglect Mary or Charles Baymiller because it had no legal responsibility to care for either of them. Additionally, Glaxo did not abuse Mary or Charles Baymiller because it did not willfully or unjustifiably inflict pain on Mary or Charles Baymiller or deprive them of food, shelter, clothing, or services when they had no relationship with either person. As such, the Court grants Glaxo's motion for summary judgment on claim 7.

Fourth, in a previous case, this Court found that a party could not be liable for negligent misrepresentation if the party did not supply the device because the party did not owe the plaintiffs a duty of care. *See Kite v. Zimmer US, Inc.*, 2006 WL 3386765 at *4 (D. Nev. 2006). In *Kite*, this Court found that negligent misrepresentation was only available if a plaintiff suffered pecuniary losses in the context of a business transaction. *Id.* As such, this Court's previous reasoning is in line with *Moretti* and *Foster*. Thus, this Court finds that Glaxo does not have a duty to warn or otherwise disseminate information about the risks associated with their generic competitors' drugs because Mary Baymiller did not purchase or ingest a Glaxo product. As such, Mary Baymiller did not have a relationship with Glaxo and Glaxo did not owe Mary Baymiller any duty to warn. Accordingly, the Court grants Glaxo's motion for

summary judgment on claim 6 for fraud and negligent misrepresentation.

Additionally, the Court grants Glaxo's motion for summary judgment on claim 3 for negligence because, as just discussed, Glaxo did not owe Mary Baymiller a duty of care because Glaxo did not manufacture the generic drug that purportedly injured Mary Baymiller. *See Turner v. Mandalay Sports Entm't, LLC*, 180 P.3d 1172, 1175 (Nev. 2008) (finding that a claim for negligence is based on an existing duty of care).

Accordingly, the Court grants Glaxo's motion for summary judgment (#59) in its entirety with prejudice.

## CONCLUSION

For the foregoing reasons, IT IS ORDERED that Glaxosmithkline LLC's motion for summary judgment (#59) is GRANTED in its entirety with prejudice.

DATED:  This 6th day of September, 2012.

_____
United States District Judge